999 F.2d 545
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Wayne MEANS, Defendant-Appellant.
 No. 92-10215.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 4, 1993.
Decided July 21, 1993.
 
 Before: GOODWIN, TANG, and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 David Wayne Means appeals on several grounds his conviction and sentence for transporting stolen and forged checks in violation of 18 U.S.C. § 2314. We affirm the conviction, but remand for sentencing to conform the amount of restitution to the underlying factual record.
 
 I.
 
 3
 In October 1987, David Wayne Means, Randall Yates, and Denise Maddin relocated from Nashville, Tennessee to Kauai, Hawaii. The three obtained employment at the Westin Kauai Resort and resided together. Two months later, Maddin returned to Nashville. In March 1988, Means and Yates also returned to Nashville. Then, between April and June 1988, eight forged Westin Kauai checks were negotiated in different banks in central Tennessee, northern Alabama, and southern Kentucky. The forged checks were examined for fingerprints and handwriting comparisons were made. Means' prints were found on two of the checks, but the handwriting analysis was inconclusive. The FBI thereafter questioned Means, Yates, and Maddin. The documentation of these interviews was sealed by the district court and thus was not subject to discovery. Means was the only one of the three charged by the FBI.
 
 
 4
 In due course, Means was indicted for transportation of stolen and forged checks in violation of 18 U.S.C. § 2314. At trial, Yates testified against Means, stating that Means had revealed to him that when he worked in the accounting department of the Westin Kauai he had taken blank checks. Means was convicted, and sentenced to six months imprisonment and six months community confinement, three years of supervised release, $8,772.20 restitution, and a $100 special assessment.
 
 II.
 A. Prosecutorial Misconduct
 
 5
 Means alleges six instances of prosecutorial misconduct during closing argument. Because defense counsel failed to object to the alleged improprieties, we review for plain error. United States v. Molina, 934 F.2d 1440, 1444 (9th Cir.1991). "The alleged error must be reviewed in the context of the entire record, and this court reverses for plain error only 'in those circumstances in which a miscarriage of justice would otherwise result.' " Id. (quoting United States v. Wallace, 848 F.2d 1464, 1473 (9th Cir.1988)).
 
 
 6
 A prosecutor is not permitted to express his or her personal opinion of the defendant's guilt nor to vouch for the credibility of government witnesses. Id. We have recognized, however, "that prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, including that one of the two sides is lying." United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir.1993).
 
 
 7
 Means contends that the prosecutor improperly suggested that Means had previously been in one of the banks in which some of the forged checks had been negotiated by stating:
 
 
 8
 Mr. Means told Agent Schaal that after he got back to Nashville, a couple of weeks later he went up into Kentucky and he had occasion to cash some checks at the bank in Gainesboro, Tennessee at the end of March. Now, he said that those were not checks from the Westin Kauai bank. We know that Mr. Means knows where one of these banks is located--and I would submit to you that he was going there to check out the bank which he then came back to a couple of weeks later.
 
 
 9
 Means argues that there was no evidence in the record that he had ever been to, or even knew the location of, the Gainesboro bank in which the forged checks were actually cashed. Thus, Means maintains that the prosecutor's suggestion to the contrary was improper. We disagree.
 
 
 10
 Means had acknowledged that he had been to a bank in Gainesboro, albeit not the one in which the forged checks had been negotiated. The prosecutor's argument that Means had been to Gainesboro to "check out" the bank he would later use to cash the forged checks was therefore reasonably grounded in the evidence. Moreover, although the language used by the prosecutor may have been imprecise, the comment does not rise to the level of plain error. Whatever error may have been committed by the prosecutor, it was cured by the district court's general instruction that the attorney's arguments were not in evidence.
 
 
 11
 Means also assigns error to the prosecutor's erroneous statement that Means was more likely to be the guilty party because he had a degree in accounting and therefore more expertise than the government's primary witness, Yates, in accounting-related matters. The prosecutor's argument was based on Yates' testimony that he believed that Means had a degree in accounting. In fact, Means' degree was in hotel management not in accounting. Means argues that this constitutes plain error because it was the government's theory that it was this accounting expertise that allowed him to "pull off" the crime. Again, this does not constitute plain error. The prosecutor properly relied on trial testimony, and the defense made no effort to correct the factual inaccuracy during trial. Most important, while the "expertise" theory of the government certainly did not help Means, his fingerprints found on two of the forged checks are more than sufficient independent evidence to support the conviction for interstate transportation.
 
 
 12
 Means also contends that the prosecutor improperly vouched for Yates by explaining that as a "night auditor" for the Westin Kauai, his duties only involved working the front desk and did not involve any accounting responsibilities even though there was no evidence in the record detailing the specific duties of a night auditor.
 
 
 13
 The government responds by noting that one of the defense's central theories at trial was that Yates had the requisite expertise to have stolen and cashed the forged checks himself. Thus, during closing, defense counsel pointed to the testimony by Yates that he had been a "night auditor" at the Westin in support of this theory. It was in response to this argument that the prosecutor offered an explanation of the position of "night auditor" during closing even though no such explanation had been presented as part of the record. The prosecutor's statement was therefore invited by the defense's statements which tacitly suggested that a night auditor's duties were accounting-related.
 
 
 14
 Next, Means argues that the prosecutor improperly shifted the burden of proof to the defendant by making the following statement:
 
 
 15
 Now, [defense counsel] is also suggesting the government is somehow trying to hide something from you; hide something from you about the banks, about fingerprints, and about handwriting.
 
 
 16
 Ladies and gentlemen, she has the same subpoena power that I do. If she thinks--or she thought there was something useful about--that could be learned about those banks on the mainland, she had the power to subpoena those people and have them come in here and testify.
 
 
 17
 If she thought there was something useful to be gained by an analysis of the fingerprints, she could have obtained her own fingerprint expert and brought him in here and had him testify to you.
 
 
 18
 This contention also fails. The statement was in response to defense counsel's attempts to show that the government had conducted a less than thorough investigation and was therefore charging the wrong person with the crime. See United States v. Ravel, 930 F.2d 721, 726 (9th Cir.), cert. denied, 112 S.Ct. 308 (1991).
 
 
 19
 Means also argues that the prosecutor impugned defense counsel's honesty and thereby violated his Sixth Amendment right to counsel when he made the following comments about defense counsel's attempt to account for Mean's fingerprints on the checks:
 
 
 20
 Think, also, ladies and gentlemen, about the likelihood of [Means] somehow inadvertently touching these checks. The checks that were touched were among the sequence of 30 that came from the bottom of a box of a thousand checks. So there is no way that he could have just perhaps opened the box by mistake and touched the top check--because they came from the bottom. That's why she had to make up the story about, well, maybe the box--maybe the checks fell out of the box, or something, see, because she has a real problem with that, trying to explain these fingerprints. She just can't do it.
 
 
 21
 Viewed in context, the prosecutor's remarks were not elegant, but neither were they so egregious as to constitute plain error. It is permissible for a prosecutor to argue that the defense is lying as long as the argument is a comment on the evidence. See United States v. Laurins, 857 F.2d 529, 539 (9th Cir.1988), cert. denied, 492 U.S. 906 (1989).
 
 
 22
 Means contends further that the prosecutor impermissibly vouched for the credibility of Yates, the primary government witness, with these remarks:
 
 
 23
 The evidence shows that Mr. Means was the one who conducted this offense. Mr. Yates was an incredible witness. You had the opportunity to observe him, to observe his demeanor. I don't find his story incredibly detailed. I don't find it impossible that he would remember the things that he told you about. And you had the chance to see him and judge his credibility as a witness, and I submit to you that he was a credible witness.
 
 
 24
 And Agent Brisby had told you he didn't take fingerprints from this man. So I would say he is an honest witness; he just didn't remember. The prints weren't taken. He was at the FBI office, and he just--you know, he just couldn't recall.
 
 
 25
 To determine whether an instance of alleged vouching requires reversal, the court should look at the following factors: the form of the vouching; whether the vouching suggests that the prosecutor has extra-record knowledge of the witnesses' truthfulness; whether the vouching suggests the court is monitoring for truthfulness; the degree of personal opinion asserted; the extent to which the witness' credibility was attacked; the specificity and timing of a curative instruction; and the importance of the witness' testimony and the vouching to the case overall. Necoechea, 986 F.2d at 1278. The court must then "balance the seriousness of the vouching against the strength of the curative instruction and closeness of the case." Id.
 
 
 26
 Here, the comment was in direct response to the attacks on Yates' credibility. The thrust of the defense presented by Means was that Yates was testifying against Means to cover up his own wrongdoing. In addition, the court gave a general curative instruction, and there was independent evidence to support the conviction against Means. All of this militates against a finding of reversible error.
 
 
 27
 Finally, Means argues that even if each individual instance of prosecutorial misconduct alone does not rise to the level of plain error, the cumulative effect of the allegedly improper remarks does. This argument is also rejected. Even cumulatively, the alleged instances of prosecutorial misconduct do not lead to the conclusion that a miscarriage of justice would result if Means does not have a second trial.
 
 B. Denial of Discovery
 
 28
 Means claims that the district court erred by refusing to disclose to the defense FBI "302 reports" summarizing interviews with Yates and Maddin pursuant to the Jencks Act, 18 U.S.C. § 3500. The district court, after in camera review, concluded that the forms need not be produced because they did not contain "statements" subject to disclosure under the Act. The 302 reports were filed under seal to preserve the issue for appeal.
 
 
 29
 In reviewing the judgment of the district court, this court must determine whether the 302 forms were "statements" within the meaning of the Jencks Act, and, if so, whether the failure to disclose prejudicially affected the defendant. United States v. Claiborne, 765 F.2d 784, 802 (9th Cir.1985), cert. denied, 475 U.S. 1120 (1986). Means also asks this court to review the contents of the documents to ensure that his Fifth and Sixth Amendment rights were not violated.
 
 
 30
 The Jencks Act defines "statement" in relevant part as a "written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). The district court correctly concluded that the forms did not fall within the purview of the Jencks Act. The forms simply contain notes by the investigator summarizing the interviews. The summaries do not purport to be substantially verbatim statements by the interviewees, nor is there any indication that the summaries were adopted by either of the interviewees. Moreover, the information relevant to Means' trial that was contained in the reports was virtually identical to that to which Yates testified at trial.
 
 
 31
 The forms did contain other information that was not related to the trial which Means argues was considered to his detriment by the district court during sentencing. We have reviewed the 302 reports and are satisfied that Means was not prejudiced by the refusal to disclose the contents of the reports.
 
 C. Aiding and Abetting Instruction
 
 32
 Means maintains that the district court impermissibly broadened his indictment by giving an aiding and abetting instruction to the jury even though the government's theory of the case throughout the proceedings was that Means had acted alone in perpetrating the crime. This argument has no merit. It is well established that "all indictments for substantive offenses must be read as if the alternative provided by 18 U.S.C. § 2 [the aiding and abetting statute] were embodied in the indictment." United States v. Gaskins, 849 F.2d 454, 459 (9th Cir.1988) (internal quotations omitted). As the Seventh Circuit stated in United States v. Galiffa, 734 F.2d 306 (7th Cir.1984), an aiding and abetting charge "need not be specifically pleaded and a defendant indicted for a substantive offense can be convicted as an aider and abettor upon a proper demonstration of proof so long as no unfair surprise results." Id. at 312 (internal quotations omitted).
 
 
 33
 Moreover, there was sufficient foundation for an aiding and abetting instruction. Even if the jury concluded that someone else had been the principal, the evidence of Means' fingerprints on two of the checks was enough to link him as an accomplice. As the government points out, this conclusion would be consistent with the defense's theory that Yates was the one who had committed the crime. Furthermore, the defense was not subjected to unfair surprise. The government submitted the aiding and abetting instruction as part of its proposed instructions prior to trial and there was no objection by the defense.
 
 D. Sufficiency of the Evidence
 
 34
 Means also argues that there is insufficient evidence to support his conviction. In reviewing a challenge to the sufficiency of the evidence, the court must ask whether, "after viewing the evidence in the light most favorable to the [government], any rational trier of fact could have found the essential elements of crime beyond a reasonable doubt." United States v. Barron-Rivera, 922 F.2d 549, 552 (9th Cir.1991) (internal quotations omitted).
 
 
 35
 There was sufficient evidence from which the jury could reasonably have concluded that Means was the one who stole and forged the checks. The fingerprint evidence, the evidence of the opportunity Means had to take the checks, and Yates' testimony, which the jury chose to believe, is more than enough to sustain the conviction.
 
 E. Amount of Restitution
 
 36
 Means argues that the presentence report, on which the district court relied, erroneously calculated the amount of restitution. Eight forged checks were at issue. Two of those checks, however, had been rejected for payment (checks G7 and G8). Although the PSR did not include the amount of the G8 check from the calculus, check G7, in the amount of $1868.78, was mistakenly included. Thus, Means argues that restitution should be for $6903.42 rather than for $8772.20. He also argues that the case should be remanded for sentencing to determine whether a shorter period of incarceration would be appropriate in light of the lower actual loss suffered by the victim.
 
 
 37
 The government contends that Means has waived this issue by failing to raise it below. See United States v. Belden, 957 F.2d 671, 674-75 (9th Cir.), cert. denied, 113 S.Ct. 234 (1992). Although we need not entertain claims that are not raised below, we have discretion to address the merits when there has been plain error. United States v. Flores-Payon, 942 F.2d 556, 558 (9th Cir.1991). Counsel at oral argument admitted that the error went unnoticed through the oversight of all counsel. Defense counsel had made a point of making sure that the G8 check not be included in the restitution calculus, but the G7 miscalculation somehow got past everyone in the proceedings below.
 
 
 38
 We find plain error in the PSR. The difference in amount affects restitution but not the prison sentence. We have previously rejected arguments suggesting that only "actual losses" may be used to determine offense levels. See United States v. Joetzki, 952 F.2d 1090, 1096 (9th Cir.1991).
 
 III.
 
 39
 Mean's conviction is affirmed. The cause is remanded, however, to permit the district court to modify the amount of restitution owed by Means in view of the error in the PSR.
 
 
 40
 Conviction AFFIRMED. The portion of the sentence related to restitution is VACATED and REMANDED for recalculation.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3